IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

RITA LOVEJOY,

                Plaintiff,

v.                                  CIVIL ACTION NO. 2:20-cv-00537

AMCOX OIL AND GAS, LLC,

                Defendant.

MEMORANDUM OPINION AND ORDER

Pending before the court are the cross-motions for summary judgment of Plaintiff Rita Lovejoy and Defendant Amcox Oil and Gas, LLC ("Amcox"). Because the motions raise substantially similar arguments in favor of summary judgment, I will dispose of them together. For the following reasons, Ms. Lovejoy's Motions for Summary Judgment, Entry of Lump-Sum Judgment, Declaratory Judgment, and for Entry of Appropriate Permanent Injunctive Relief [ECF No. 102] are **DENIED**; and Amcox's Motion for Summary Judgment [ECF No. 106] is **GRANTED in part and DENIED in part**.

I.    **Background**

Plaintiff Rita Lovejoy owns property located along Palermo Road near the Upper Mud River in Lincoln County, West Virginia. [ECF No. 103 at 2]. Ms. Lovejoy complains that Amcox is the current owner of a natural gas well and pipeline that sit on her property (collectively, the "Facility"). [ECF No. 1 ¶ 1]. The Facility includes a

device known as a "drip line" used for the periodic removal of condensate that may flow through the pipeline and obstruct the flow of gas, as well as a barrel located next to that device that was presumably used for storage of the removed condensate. [ECF No. 105 at 2].

In 2018, Ms. Lovejoy became concerned that certain hazardous or solid wastes from the Facility had migrated onto her property. [ECF No. 103 at 2]. Ms. Lovejoy commissioned an environmental investigation which took place on October 16, 2018 and revealed the presence of several "contaminants of concern" in the groundwater and in the soil. *Id.* at 2–3. Namely, Ms. Lovejoy alleges that the organic compound Bis(2-ethylhexyl)phthalate ("DEHP"), a known carcinogen, was discovered in the groundwater and in the soil adjacent to the Facility. This compound does not naturally occur in groundwater or soil and is considered a "priority pollutant" under the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"). Additional compounds were detected in soil samples taken from the area adjacent to the Facility; these include Benzo(a)anthracene, Benzo(b)fluoranthene, Benzo(k)fluoranthene, Chrysene, Fluoranthene, Phenanthrene, and Pyrene. [ECF No. 39 ¶¶ 15–16, 79].

Ms. Lovejoy's evidence centers on the testimony of her expert witness, Dr. David Scott Simonton, who conducted the initial testing on her property. When performing that testing, Dr. Simonton detected a petroleum odor and observed staining on the Facility and the surrounding soil. [ECF No. 102-1 at 7]. Based on

2

those physical observations, Dr. Simonton selected locations for collecting samples, which revealed the presence of contaminants. [ECF No. 105-4 at 88]. In response to Dr. Simonton's findings, Plaintiff ceased her commercial activities on the property and filed the instant lawsuit. According to Dr. Simonton, the Facility is the only plausible source of the contaminants because no other industrial operations have historically existed on the property. [ECF No. 102-1 at 7]. He also cites three publications showing that some of the contaminants have been found in studies of certain oil and gas processes. *Id.* at 7–8 nn.2–4.

In August 2019, Dr. Simonton returned to the Lovejoy Property with Adam Wilson, a contractor retained by Defendant Jackson Resources Company ("Jackson"). Mr. Wilson collected soil samples from the same locations as Dr. Simonton (RL1 and RL2) and from a third location farther away from the Facility (RL3). [ECF No. 105 at 6]. During the visit, Mr. Wilson did not observe any staining, odors, or dead vegetation in the vicinity of the Facility. [ECF No. 105-13 ¶ 6]. Mr. Wilson's testing confirmed the presence of the contaminants identified by Dr. Simonton, although many contaminants were found at higher concentrations in the sample collected farther from the Facility. [ECF No. 105 at 16 n.68].

Defendant's expert, Dr. Gregory Cotten, opines that the contaminants are commonly associated with plastics or with the incomplete combustion of organic materials, and should not be attributed to Defendant's operations. [ECF No. 105-16,

at 18 t.3]. Dr. Cotten's analysis demonstrates that all contaminants were found well within acceptable levels. [ECF No. 105 at 19].

Ms. Lovejoy brought seven claims against Defendants Jackson and Amcox[1]: recovery of response costs associated with a contaminated site and declaratory judgment that Jackson and Amcox are liable for response costs under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (**Count I**); citizen suit relief from permitting violations under RCRA and the West Virginia Hazardous Waste Management Act ("WVHWMA") (**Count II**); citizen suit relief for judicial abatement of an imminent and substantial endangerment under RCRA (**Count III**); judicial abatement of a public nuisance under West Virginia law (**Count IV**); relief for a private nuisance (**Count V**); negligence (**Count VI**); and strict liability (**Count VII**).

Prior to reaching a settlement agreement with Plaintiff, Defendant Jackson moved to dismiss the claims. [ECF No. 14]. I denied the motion in part and granted it in part, dismissing Counts II, IV, and VII against Jackson. [ECF No. 56]. Amcox moves for summary judgment on the remaining claims.[2] [ECF No. 106]. In her

---

[1] Ms. Lovejoy initially named only Jackson as a defendant, but I granted her motion to amend her complaint, and she pleaded all of her claims against both Jackson and Amcox, who was joined as a necessary party pursuant to Federal Rule of Civil Procedure 19. *See* [ECF Nos. 1; 29; 38; 39, at 29 ("Plaintiff incorporates Defendant AMCOX, as a Defendant, along with Jackson, into Counts I-VII of this Proposed Amended Complaint and all preceding paragraphs.")].

[2] Amcox also joins in Jackson's Motion for Summary Judgment, [ECF No. 105], as well as Jackson's Response in Opposition to Plaintiff's Motion for Summary Judgment, [ECF No. 113], and incorporates other relevant memoranda of law. Amcox has not joined in Jackson's Motion to Strike Exhibit 4 of Plaintiff's Motions for Summary Judgment, [ECF No. 112], and since Jackson has been dismissed as a defendant, I do not address that Motion here.

response, Ms. Lovejoy agrees that the court should grant Amcox summary judgment as to Counts IV and VII, leaving the following **five** claims against Amcox: recovery of response costs associated with a contaminated site and declaratory judgment that Amcox is liable for response costs under CERCLA (**Count I**); citizen suit relief from permitting violations under RCRA and the WVHWMA (**Count II**); citizen suit relief for judicial abatement of an imminent and substantial endangerment under RCRA (**Count III**); relief for a private nuisance (**Count V**); and negligence (**Count VI**). [ECF No. 56; ECF No. 111 at 6].

Ms. Lovejoy moves for Partial Summary Judgment, Permanent Injunction, and Entry of Appropriate Declaratory and Permanent Injunctive Relief on Counts I, II, and III. [ECF No. 102]. I address each of the parties' respective arguments for each claim in turn.

## II.   Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The moving party may meet its burden of showing that no genuine issue of material fact exists by use of "depositions, answers to interrogatories, answers to

requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Rather, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in [her] favor" and must "set forth specific facts" that offer more than a "scintilla of evidence" in support of her position. *Anderson*, 477 U.S. at 252, 256. Conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation omitted). "When considering each individual motion,

the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.*

### III.   Discussion

I address each party's respective arguments as to each claim on summary judgment.

#### A.   CERCLA (Count I)

Section 107 of CERCLA provides for strict liability for responsible parties. *See United States v. Monsanto*, 858 F.2d 160, 167 (4th Cir. 1988). "Congress enacted CERCLA to address the increasing environmental and health problems associated with inactive hazardous waste sites." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 841 (4th Cir. 1992). The statute encourages private cleanup of such hazards by providing a cause of action for the recovery of costs incurred in responding to a "release" of hazardous substances at any "facility." 42 U.S.C. § 9607. A person who incurs such cleanup costs is entitled to recover from anyone who qualifies as a "responsible person" under the statute. *Id.* Responsible persons include the current "owner" or "operator" of the facility or any person who "owned" or "operated" the facility at the time of "disposal." *Id.* § 9607(a)(2).

To succeed on a cost recovery claim under Section 107(a) of CERCLA, a plaintiff must establish that (1) the defendant is a potentially responsible person ("PRP"); (2) a CERCLA "facility" exists; (3) a hazardous substance has been released or threatens to be released from the defendant's facility; and (4) the release or

threatened release has caused the plaintiff to incur response costs that are "necessary" and "consistent with the National Contingency Plan" ("NCP"). *PSC Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161, 167–68 (4th Cir. 2013). A claim for response costs may "be established entirely through circumstantial evidence." *Tosco Corp. v. Koch Indus.*, 216 F.3d 886, 892 (10th Cir. 2000) (noting that requiring direct evidence relating to disposal that occurred in the past is inappropriate). The plaintiff need not "prove its case with mathematical precision . . . or scientific certainty." *Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 355 F.3d 574, 590 (6th Cir. 2004); *see also Acushnet v. Mohasco Corp.*, 191 F.3d 69, 76 (1st Cir. 1999) (CERCLA does not "cast the plaintiff in the impossible role of tracing particular waste to particular sources . . . a task that is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years."). Nevertheless, the plaintiff must present "sufficient evidence from which a reasonable and rational approximation of each defendant's individual contribution to the contamination can be made." *In re Bell Petroleum Servs.*, 3 F.3d 889, 903 (5th Cir 1993).

Ms. Lovejoy alleges that the substances detected in soil and groundwater samples from her property are "solid wastes" within the meaning of 40 C.F.R. § 261.1 and "hazardous wastes" within the meaning of 40 C.F.R. Part 261 and Title 33, Series

20, of the West Virginia Code of State Rules, and that the pipeline is a "facility" under CERCLA. [3]

Both parties move for summary judgment on this claim. Amcox argues that it is entitled to summary judgment because Ms. Lovejoy cannot show that there has been a "release" from the Facility, and because Ms. Lovejoy has not incurred "response costs" recoverable through CERCLA.

### i. "Release" of hazardous substances

The parties dispute whether there has been a "release or threatened release" of hazardous substances from the Facility. It is well established that "release" is defined broadly and includes passive conduct such as "leaking," "escaping," and "leaching." 42 U.S.C. § 9601(22); *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 680 (4th Cir. 1995).

Less established, however, is the amount of evidence needed for a plaintiff to prove her *prima facie* case. "CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage. Problems of interpretation have arisen from the Act's use of inadequately defined terms, a difficulty particularly apparent in the

---

[3] "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9). The Facility consists of a "pipeline" and other "equipment" expressly included in the definition of "facility" under CERCLA. Moreover, if Ms. Lovejoy can establish a release of hazardous substances from the Amcox Facility, then the "facility" element of her CERCLA claim is also met. *See* [ECF No. 113 at 8].

response costs area." *Artesian Water Co. v. Gov't of New Castle Cnty.*, 851 F.2d 643,
648 (3d Cir. 1988). As courts routinely recognize, "scientific certainty . . . is not always
a realistic goal in environmental science," *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 526
(2d Cir. 1996), *overruled on other grounds by State of N.Y. v. Nat'l Servs. Indus., Inc.*,
352 F.3d 682 (2d Cir. 2003), and requiring a plaintiff to prove actual contamination
by the defendant's waste "would thus eviscerate section 107." *Artesian Water*, 659 F.
Supp. 1269, 1282 (D. Del. 1987), *aff'd*, 851 F.2d 643. Accordingly, the United States
Court of Appeals for the Fourth Circuit has held that to establish a release, the
plaintiff must show "only that contaminants which were once in the custody of the
defendant could have travelled onto the plaintiff's land, and that subsequent
contaminants (chemically similar to the contaminants once existing in defendant's
custody) on the plaintiff's land caused the plaintiff to incur cleanup costs." *Westfarm*,
66 F.3d at 681 (citing *Monsanto*, 858 F.2d at 169). The presence of "any detectable
amount" of a hazardous substance, without regard to concentration, is sufficient.
*HRW Sys., Inc. v. Wash. Gas Light Co.*, 823 F. Supp. 318, 340 (D. Md. 1993); *see also
Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989). A CERCLA plaintiff
need not prove that contaminants on her property actually migrated from the
defendant's property, but she must "demonstrate that the defendant has deposited
hazardous waste." *White v. Cnty. of Newberry, S.C.*, 985 F.2d 168, 174 (4th Cir. 1993).
Once a plaintiff has made her *prima facie* showing of a release, the burden shifts to

the defendant to show that the release was caused "solely by an act of God, an act of war or by a third party." 41 U.S.C. § 9607(b).

Amcox argues that Ms. Lovejoy cannot show that hazardous substances were ever in Defendant's possession because there is no direct evidence of contamination at the Facility and because Ms. Lovejoy has failed to show that the contaminants originate, derive, or occur as a component or byproduct of the natural gas processes of the Facility.

Ms. Lovejoy's expert witness, Dr. Simonton, testifies that he observed staining on Amcox's equipment and on the surrounding soil, and he noted a petroleum smell in the area. [ECF No. 102-1 at 7]. He also opines that the contaminants found on Ms. Lovejoy's property are "associated with oil and gas" and therefore can be attributed to Amcox's operations on the property. *Id.* As evidence of this association, Dr. Simonton cites three publications discussing the contaminants found in studies of oil and gas operations. *Id.* at 7–8.

Amcox disputes the relevance of the publications cited by Dr. Simonton, pointing to differences between the settings of those studies and the setting at issue here. [ECF No. 105 at 16–17]. Amcox also argues that the contaminants more likely originated from sources other than oil and gas operations, including from Plaintiff's own plastic materials. [ECF No. 104 at 2–3]. Defendant's expert, Mr. Wilson, denies detecting any odors or staining around the Facility. [ECF No. 105-13 ¶ 6]. Mr. Wilson's testing found higher concentrations of contaminants in sample RL3 than in

11

the samples collected closer to the Facility. [ECF No. 105 at 16]. Dr. Simonton notes, however, that RL3 is inappropriate as a "background" sample due to its location "immediately down gradient" of the area of concern. [ECF No. 105-4 at 112; ECF No. 105-23 ¶ 12].

Amcox points out that the publications cited by Dr. Simonton do not name most of the contaminants found in the samples from Ms. Lovejoy's property. [ECF No. 105 at 16–17]. It is undisputed that DEHP—the one contaminant found in all three publications and in every sample from the Lovejoy Property—is used mainly as a plasticizer, added to polyvinyl chloride ("PVC") plastics to make them flexible. [ECF No. 105-16 at 18; ECF No. 102-1 ¶ 27 n.1]. The parties do not dispute that Amcox's Facility is unrelated to PVC or other plastics. Nor do they dispute the presence of plastic materials on the property which cannot be attributed to the Facility.[4] But merely identifying a plausible alternate source does not foreclose a finding that hazardous substances were released or threaten release from the Facility, and Amcox does not offer independent evidence that no hazardous substances are present at the Facility. *See Artesian Water*, 659 F. Supp. at 1281–82 ("Mere expert opinion as to the weight of the moving party's evidence, without an offer of independent facts by the nonmoving party, cannot under the facts of this case be permitted to defeat summary judgment.").

---

[4] Without factual support, I am not required to accept Dr. Simonton's conclusory opinion that "no other source [of the contaminants] reasonably exists." [ECF No. 102-1 at 8].

Amcox also states incorrectly that none of the papers cited by Dr. Simonton identifies any of the other contaminants. [ECF No. 113 at 6]. The Groundwater Protection Council report mentions fluoranthene, mercury, phenanthrene, and pyrene, in addition to DEHP. [ECF No. 105-22 at 10, 22]. Defendant's own expert, Dr. Cotten, opines that two of these compounds—fluoranthene and pyrene—are "found in coal, oil, and gas." [ECF No. 105-16 at 19 t.3].

Amcox emphasizes that Ms. Lovejoy relies on inference to establish a release. Defendant stresses that no one has seen any liquid physically flowing from the Facility and that nothing in the record directly links the contaminants to the processes of the Facility. [ECF No. 105 at 15–16]. But CERCLA permits a private plaintiff to rely on inference; "only minimal thresholds are necessary to demonstrate a release." *Courtland Co. v. Union Carbide Corp.*, No. 2:19-cv-00894, 2021 WL 4944038, at *5 (S.D. W. Va. Oct. 22, 2021) (citing *Rhodes v. Cnty. of Darlington, S.C.*, 833 F. Supp. 1163, 1178 (D.S.C. 1992)); *cf. Tosco*, 216 F.3d at 892 ("CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence."). Plaintiffs often seek inferences with respect to the pathway by which contaminants could have migrated between properties; and courts typically grant those inferences given that "[c]ontrary to the rule followed in most areas of law, the burden of proof as to causation in a CERCLA case lies with the defendant." *Westfarm*, 66 F.3d at 681. But, recognizing the difficulties of proof throughout the CERCLA framework, courts have extended this generosity of inference to the plaintiff's burden

13

of showing the defendant's custody over contaminants. *See, e.g.*, *Artesian Water*, 659 F. Supp. 1269 (finding a "release" where toxic wastes were present near the defendant's landfill, even though no samples were taken within the landfill's boundaries, the plaintiff "offered no evidence that hazardous substances were actually disposed of" at the landfill, and the contaminants could easily have come from another nearby landfill); *Asarco LLC v. Cemex, Inc.*, 21 F. Supp. 3d 784 (W.D. Tex. 2014). As an example, the plaintiff in *Asarco* relied on inference to attribute arsenic contamination to a nearby property on which a cement plant had previously operated. 21 F. Supp. 3d at 809. The parties generally agreed that surface water patterns would allow for contaminants to migrate from the plant to the relevant property; at issue was whether arsenic had ever been used at the plant such that it could have traveled along that established contamination pathway. The plaintiff relied on a 1989 report, commissioned by a potential purchaser at the time, which detailed heavy dust accumulation throughout the plant property. The parties' experts agreed that cement kiln dust ("CKD") contains arsenic, but they disputed whether the dust noted in the report "was indeed CKD rather than other, potentially less hazardous, dust byproducts of the cement-making process." *Id.* at 794. Testing had not been performed at the plant to confirm the presence of arsenic or CKD, but the report suggested that some limited sampling revealed chemical properties consistent with CKD, such as elevated pH. *Id.* at 795. Following a bench trial, the court found

14

for the plaintiff, concluding that at least some of the dust on the plant property likely was CKD. *Id.* at 809.

CERCLA does not, however, grant a plaintiff unlimited latitude. She must still produce evidence from which a release can be rationally inferred, and the burden of proof as to causation does not shift to the defendant until the plaintiff proves her *prima facie* case. For example, in *Gallagher v. T.V. Spano Building Corporation*, an EPA survey revealed the presence of organic chemicals on the plaintiff homeowners' properties. 805 F. Supp. 1120, 1123 (D. Del. 1992). The homeowners instituted a CERCLA action against a real estate developer who buried "site preparation and construction debris" within a right-of-way running through the subdivision. *Id.* at 1130. The court granted summary judgment to the defendant developer, finding no evidence of hazardous substances linked to the discarded debris, which included tree stumps, wood, plywood, and empty paint cans. *Id.*

This case is incredibly close, but I find that Ms. Lovejoy's evidence is minimally capable of establishing Amcox's liability. Dr. Simonton testifies to odors and staining around the Facility; those facts, if true, support an inference that fluid leaked from the Facility onto Ms. Lovejoy's property. Dr. Simonton also cites publications indicating that at least some oil and gas operations are linked to hazardous substances, which may include the contaminants found on Ms. Lovejoy's property. Given that CERCLA creates liability for "threatened" releases in addition to actual releases, Ms. Lovejoy presents more—though not much more—than a "scintilla of

evidence" in support of her claim.[5] Defendant cogently criticizes Ms. Lovejoy's chain of evidence, but those arguments are best resolved at trial, where I expect effective examination of expert witnesses to bring clarity to this matter. At this stage, I find summary judgment for either party inappropriate.

### ii. Response costs

Amcox next argues that Ms. Lovejoy has not incurred any costs in responding to the alleged release. In the alternative, Amcox argues that any costs incurred were not "necessary" or "consistent with the National Contingency Plan."

### 1. Incurrence of costs

Amcox argues that even if Ms. Lovejoy can establish a "release," she has not actually incurred any costs in response. Ms. Lovejoy contends that she paid her lawyer a $10,000 retainer, from which Dr. Simonton was paid a $2,000 retainer,[6] and that Dr. Simonton has billed additional time relevant to his response actions. [ECF No. 110 at 6; ECF No. 105-4 at 186]. Amcox counters that the record lacks documentation supporting the claim that Dr. Simonton's retainer was paid out of the retainer to Ms. Lovejoy's attorney. [ECF No. 116 at 9]. Amcox also points out that Dr. Simonton has not submitted an invoice for his work, so Ms. Lovejoy has not compensated him for anything. *Id.*

---

[5] In reaching this conclusion, I also consider CERCLA's remedial objectives and the broader principles evinced by its burden-shifting framework. These considerations weigh in favor of permitting the case to proceed to trial. *Cf. Dana Corp. v. Am. Standard, Inc.*, 866 F. Supp. 1481, 1497 ("[A]n inference that the waste found at the site came from that defendant is permissible and is sufficient to defeat a summary judgment motion, even if it would not ultimately be sufficient to persuade the trier of fact.").
[6] Attorney fees are generally not recoverable under CERCLA, but certain fees paid to expert consultants can be recovered. *See Key Tronic Corp. v. United States*, 511 U.S. 809 (1994).

I first address Amcox's legal argument that Ms. Lovejoy cannot recover the costs of Dr. Simonton's uninvoiced services because CERCLA limits recovery to costs actually "'incurred'—not 'to be incurred.'" *In re Dant & Russell, Inc.*, 951 F.2d 246, 249 (9th Cir. 1991) (quoting CERCLA § 9607(a)(4)(B)). Amcox relies on just one case, *In re Dant & Russell*, in which the Ninth Circuit denied recovery for "nothing but bare assertions" that the defendant "will perform future cleanup." *Id.* at 250 ("This case provides no occasion for defining what 'incurred' means—only what it does not mean."). The facts of this case are very different. This case involves completed actions not yet invoiced. The parties do not dispute that Dr. Simonton performed services for which Ms. Lovejoy accrued liability. Actual payment is not required for costs to have been "incurred" where a legal obligation has accrued. *See Trimble v. Asarco, Inc.*, 232 F.3d 946, 958 (8th Cir. 2000), *abrogated on other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).

Having concluded that unpaid liabilities constitute costs "incurred," I also find that Ms. Lovejoy's evidence shows she has incurred costs. Triable issues remain as to the extent of Ms. Lovejoy's expenses, and, as I discuss below, whether they qualify as "response costs" recoverable under CERCLA.

## 2. Necessary response costs

While CERCLA provides plaintiffs with a generous liability framework, their recovery is limited to the necessary costs of responding to a reasonable threat. Thus, a plaintiff may be able to show the minimal release required to establish her *prima*

17

*facie* case, but "it is the nature of the costs for which relief is sought that dictates the extent to which the plaintiff must show the effects of releases or threatened releases from the defendant's facility on the environment." Kim Kochner, *Recovery of Response Costs Under CERCLA: A Question of Causation Under* Dedham Water Co. v. Cumberland Farms Dairy, Inc., 3 Vill. Env't L.J. 225, 243 (1992). Response costs are "necessary" when "an actual and real threat to human health or the environment exists" and "the response action is addressed to that threat." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 871–72 (9th Cir. 2001).

Ms. Lovejoy claims $11,420.20 in response costs, which she expended on initial monitoring and investigation. [ECF No. 102 at 11]. To recover her costs under CERCLA, Ms. Lovejoy must show that she acted in response to a perceived threat, and that her response was reasonable in light of the facts known to her while she expended response costs.

As discussed above, the parties dispute the existence of a release or threatened release from the Facility. The parties also dispute how Ms. Lovejoy became concerned about potential contamination on her property. Ms. Lovejoy claims that sludge in her irrigation system led her to investigate, and that staining and odors around the Facility prompted laboratory testing. [ECF No. 105-3 at 112; ECF No. 105-4 at 69–70]. Amcox argues that Ms. Lovejoy responded to unfounded suggestions from her attorney and expert witness, rather than to any reasonably perceived threat. [ECF No. 113 at 2–3; ECF No. 105-3 at 123–24]. Amcox argues further that even if Ms.

Lovejoy had legitimate cause for concern, her "biased" environmental investigation was an unreasonable response to the perceived threat. [ECF No. 107 at 3].

Reasonableness is an inherently factual inquiry most appropriately determined by a trier of fact. Moreover, the parties' conflicting evidence creates genuine issues of material fact. Neither party is entitled to summary judgment on this issue.

### 3. Response consistent with the NCP

Amcox further argues that any response costs incurred by Ms. Lovejoy are inconsistent with the National Contingency Plan. The NCP is established under CERCLA § 105, 42 U.S.C. § 9605, and "sets forth an array of requirements 'potentially applicable to private party response actions' regarding, *inter alia*, worker health and safety; documentation and cost recovery; permit requirements; reports of releases to the National Response Center ('NRC'); removal site evaluation and actions; remedial site evaluation; selection of a remedy; and providing an opportunity for public comment concerning the selection of a response action." *Courtland*, 2022 WL 2400038, at *19 (citing 40 C.F.R. § 300.700(c)(5)–(6)). A private party's response action is considered "consistent with the NCP" if the action, "when evaluated as a whole, is in substantial compliance with the applicable requirements" set forth in paragraphs (5) and (6) of 40 C.F.R. § 300.700(c), and "results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i).

19

Amcox argues that Dr. Simonton's investigation falls short of the NCP's standards for a remedial site investigation. Although Dr. Simonton concedes his assessment was not a true site investigation, Ms. Lovejoy maintains that any deviations are "immaterial or insubstantial" and therefore the investigation is "not inconsistent" with the NCP. [ECF No. 110 at 6]; *see* 40 C.F.R. § 300.700(c)(4).

Compliance with the NCP is a factual question more appropriately resolved at trial. But Ms. Lovejoy also argues that a court need not assess NCP-compliance for a plaintiff to recover preliminary monitoring and investigation costs.

Although there is divided authority, "many courts have held that initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements." *Courtland*, 2022 WL 2400038, at *20 (quoting *CNH Am., LLC v. Champion Env't Servs., Inc.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (collecting cases)). As recognized by these courts, "[t]he bulk of the NCP guidelines appear to apply to actual removal and remedial procedures but do not logically appear applicable to the initial assessment aspects of a cleanup." *Id.* at *20 (quoting *Weyerhaeuser Corp. v. Koppers Co.*, 771 F. Supp. 1406, 1414 (D. Md. 1991)). Accordingly, plaintiffs can recover expenditures for investigatory procedures, instituted in response to a release or threatened release, even when that investigation indicates that no contamination took place. *See Artesian Water*, 851 F.2d at 651. Other courts, however, have concluded that preliminary costs are recoverable only when there is "'some nexus' between the alleged response cost and

20

'an *actual cleanup* of hazardous releases.'" *Id.* at *19 (quoting *Young v. United States*, 394 F.3d 858, 864 (10th Cir. 2005) (emphasis in original)).

I am persuaded by the weight of authority that investigatory sampling costs incurred in direct response to concerns of contamination constitute "necessary" costs of response "that are consistent with the NCP, irrespective of any literal compliance therewith." *Id.* at *20. It is well established that CERCLA must be viewed broadly to achieve its legislative goals. *First United Methodist Church v. U.S. Gypsum Co.*, 882 F.2d 862, 867 (4th Cir. 1989). Those goals include the discovery and removal of hazardous substances. *HRW Sys., Inc.*, 823 F. Supp. at 345. Given this context, "*any* investigation which could lead to the discovery of hazardous substances at a site, or the extent to which the site is polluted, could be considered 'necessary' in order to accomplish the goals of the statute." *Id.* (emphasis in original).

Ms. Lovejoy need not show NCP-compliance to recover the costs of her preliminary investigation, but she must still establish that the investigation was "precipitated by a release of a hazardous substance and necessary to the remediation thereof." *Krygoski Const. Co. v. City of Menominee*, 431 F. Supp. 2d 755, 765 (W.D. Mich. 2006) (quoting *Foster v. United States*, 926 F. Supp. 199, 203 (D.D.C. 1996)). Amcox is liable for Ms. Lovejoy's preliminary costs only if there was "a reasonable risk" of contamination, and if "the monitoring and evaluation expenses were incurred by the plaintiff in a reasonable manner." *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1219 (3d Cir. 1993). As discussed above, there are triable

21

issues of fact regarding any staining, odor, or plant discoloration observed on the Lovejoy Property. If those issues are resolved in Ms. Lovejoy's favor, a jury could also find that her investigation was reasonable. On the CERCLA claim, therefore, both parties' motions for summary judgment are **DENIED**.

### B. RCRA 42 U.S.C. § 6972(a)(1)(A) and WVHWMA Permitting Violation (Count II)

RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste. *Courtland*, 2022 WL 2400038, at *38. The primary purpose of RCRA is "to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, so as to minimize the present and future threat to human health and the environment." *Id.* (quoting *Meghrig v. KFC W., Inc.*, 516 U.S 479, 483 (1996)). The Environmental Protection Agency ("EPA") Administrator and the Secretary of the West Virginia Department of Environmental Protection are responsible for developing and promulgating criteria for identifying the characteristics of hazardous waste, as well as permit requirements for its storage, treatment, and disposal. *See* 42 U.S.C. § 6921(a); W. Va. Code § 22-18-6(a)(2).

Both Ms. Lovejoy and Amcox move for summary judgment on this claim. Ms. Lovejoy alleges in Count II that Amcox has violated the statutory provisions and the hazardous waste permitting regulations promulgated by the EPA under RCRA Subchapter III, or Subtitle C, 42 U.S.C. §§ 6921–6939, and by the state of West Virginia under its Hazardous Waste Management Act, W. Va. Code §§ 22-18-1–22-

22

18-25. Those statutes and regulations prohibit the treatment, storage, or disposal of hazardous wastes that are listed in EPA regulations without a hazardous waste permit authorizing such activities. 42 U.S.C. § 6928; W. Va. Code § 22-18-8(a). Ms. Lovejoy alleges that Amcox has no such permit, yet sampling of the groundwater and soil near the Facility detected various contaminants that are "solid waste," within the meaning of 40 C.F.R. § 261.2 and "hazardous waste" under 40 C.F.R. Part 261, as well as Title 33, Series 20, of the West Virginia Code of State Rules. [ECF No. 111 at 5]. RCRA authorizes suit "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter . . . ." 42 U.S.C. § 6972(a)(1)(A).

RCRA defines "hazardous waste" as:

> [A] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may -- (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

Amcox does not dispute that it lacks a permit for handling hazardous wastes but argues that such a permit is unnecessary because Amcox never handled the contaminants found on Ms. Lovejoy's property. Amcox denies the release of any relevant substances in connection with its operations on the subject property and

argues that Ms. Lovejoy has not been able to show any evidence that these substances originated from the Facility. [ECF No. 107 at 9]. And even if Ms. Lovejoy can show a release, Amcox argues that she failed to provide proper notice of her citizen suit, and that the Facility is exempt from RCRA's coverage. *Id.*

### i. Notice

Amcox first argues that Ms. Lovejoy failed to provide notice required by RCRA. RCRA provides that before filing a lawsuit under § 6972(a)(1), a plaintiff must provide the defendant with a notice of intent to sue at least 60 days before filing a suit for permitting violations under subsection (a)(1)(A) or 90 days before filing suit pursuant to subsection (a)(1)(B). 42 U.S.C. § 6972(b)(2)(A). Failure to do so is grounds for dismissal of a RCRA claim. *See City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 722 (N.D. Ill. 2017). "A notice of intent to sue must be 'sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit.'" *Id.* I have already ruled, however, that the notice provided to Jackson, the owner of the Facility at the time, was sufficient. [ECF No. 56 at 10]. Amcox purchased the Facility which had been provided notice and Amcox made its purchase subject to such notice. I find dismissal inappropriate on this ground.

### ii. Bentsen Amendment

Amcox next argues that its activities on the Lovejoy Property are exempt from regulation under the "Bentsen Amendment" to RCRA, which states that "drilling

24

fluids, produced waters, and other wastes associated with the exploration, development, and production of crude oil or natural gas or geothermal energy shall be subject only to existing State or Federal regulatory programs in lieu of Subtitle C." 42 U.S.C. § 6921(b)(2)(A). Ms. Lovejoy argues that this exemption is expressly limited to wastes generated by activities "uniquely associated with the exploration, development or production of crude oil or natural gas at primary field operations" (i.e., wastes from down hole or wastes that have otherwise been generated by contact with the production stream during the removal of produced water or other contaminants from the product). [ECF No. 111 at 2–4].

The Bentsen Amendment exempts only waste materials "intrinsically derived from primary field operations." [ECF No. 111-1 at 6]. That language "is intended to distinguish exploration, development, and production operations from transportation and manufacturing operations." *Id.* EPA guidance directly addresses whether natural gas condensate, or "drip gas," is exempt from RCRA permitting requirements, clarifying that drip gas collected from lines associated with the movement of natural gas "on-site (i.e., the exploration, development, or production site)" is exempt from classification as hazardous waste. U.S. Env't Prot. Agency, RO 13253, *Drip Gas Exclusion* (1989); *see also* U.S. Env't Prot. Agency, RO 13617, *Natural Gas Condensate Regulatory Status* (1993). On the other hand, "if the drip gas is collected from lines that are used for the off-site movement of natural gas, the drip gas is not excluded." *Drip Gas Exclusion*. EPA illustrates this distinction by way of example,

25

comparing "drip gas from gathering lines on the production site that lead to an on-site central storage tank," which would be exempt, to "drip gas collected from lines used to transport natural gas from the production site to an off-site distribution center," which would be regulated. *Id.* As Ms. Lovejoy notes, "[s]imilar wastes generated by activities other than E&P operations are not covered by the exemption." [ECF No. 111 at 3 (quoting ECF No. 111-1 at 9)].

Amcox argues that Ms. Lovejoy's claim must fail because the alleged release of hazardous substances originated from a transmission line, which is "fundamentally related to the development of natural gas." [ECF No. 114 at 8]. Amcox does not address the distinction between processes associated with exploration, development, and production of natural gas and those associated with transportation or manufacturing. Nothing in the record suggests that the transmission line carries gas between a production site and another on-site area. Even if the plugged gas well and its surroundings are considered a production site, the pipeline extends beyond that area, traversing property that cannot be characterized as "on-site." Because Amcox has not shown that the Facility involves "primary field operations" exempt under the Bentsen Amendment, summary judgment for Amcox on this ground is unwarranted.

### iii. Hazardous waste

Although Amcox's activities are not categorically exempt from the permitting requirements, Ms. Lovejoy must still show that Amcox engages in activities for which

permits are required, i.e., that Amcox is involved in the "treatment, storage, or disposal" of hazardous waste. 42 U.S.C. § 6925(a).

As discussed with respect to Count I, the parties dispute whether any contaminants are "leaking," "escaping," or "leaching" from the Facility, which would constitute "disposal" within the meanings of RCRA and WVHWMA. Given this genuine issue of material fact, both parties' motions for summary judgment on Count II are **DENIED**.

### C. Citizen suit relief for judicial abatement of an imminent and substantial endangerment under RCRA (Count III)

RCRA permits citizen suits to be commenced against "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* § 6972(a)(1)(B). "In contrast to claims brought under subsection (a)(1)(A), claims under subsection (a)(1)(B) may be brought regardless of whether the plaintiff can demonstrate that the defendant's actions violated a specific RCRA-based permit." *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 505 (4th Cir. 2015). The district court may restrain any person who has "contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste." 42 U.S.C. § 6972(a)(1)(B). And, to remedy a violation of either subsection, the court has authority "to order [a defendant] to take

27

such other action as may be necessary." *Id.* § 6972(a). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste into air or water[,] such that solid waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id.* § 6903(3).

Both parties move for summary judgment on this claim. Ms. Lovejoy alleges first that Amcox is a person who has "contributed . . . to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste." [ECF No. 39 ¶ 48]. Ms. Lovejoy identifies the substances that were revealed during the environmental investigation as "solid wastes" within the meaning of 42 U.S.C. § 6903(27) and "hazardous waste" within the meaning of 42 U.S.C. § 6903(5). Ms. Lovejoy alleges that these contaminants have "been shown to cause or significantly contribute to an increase in mortality or an increase in serious irreversible . . . illness, and each poses a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." [ECF No. 39 ¶47]. The statute clearly authorizes enforcement against past handlers who may have allowed hazardous substances to leak or spill out of their industrial property.

Amcox argues that Ms. Lovejoy has failed to demonstrate the potential for immediate and substantial harm because contaminants were not found at "elevated levels." [ECF No. 105 at 25]. Amcox further argues that Ms. Lovejoy has failed to

28

show a causal connection between Amcox and any contamination, because the contaminants found are not "associated with oil and gas" and because no "release" from the Facility has occurred.

Despite Ms. Lovejoy's insistence that contaminants were found at "elevated levels," the undisputed facts show that no contaminants were found at harmful concentrations. [ECF No. 102-2 at 4–5]. Ms. Lovejoy stresses that RCRA provides relief from a disposal that "may" present an imminent and substantial endangerment. She emphasizes that "endangerment" means "a threatened or potential harm and does not require proof of actual harm" and that "imminent" means that there is a present threat now, "although the impact of the threat may not be felt until later." *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). As both parties agree, an endangerment is "substantial" when there is "reasonable cause for concern that someone or something may be exposed to risk of harm by a release or threatened release of hazardous substances in the event remedial action is not taken." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007).

Ms. Lovejoy relies entirely on Dr. Simonton's testimony to establish "reasonable cause for concern." *See* [ECF No. 115 at 8]. But nothing in Dr. Simonton's testimony—nor anything else in the record—allows a jury to find a reasonable prospect of future harm that is "near-term and potentially serious." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 212 (2d Cir. 2009). The Complaint identifies health risks associated with the compounds found on Ms. Lovejoy's property. [ECF

29

No. 39 ¶16]. But the record is devoid of factual support for these risks, notwithstanding Dr. Simonton's vague conclusions. *See* [ECF No. 115 at 8–9]. And even assuming each contaminant is associated with identifiable health risks, there is no evidence of the particular risks presented by those contaminants on the Lovejoy Property. The "mere presence" of contaminants, even at high concentrations, is "alone not enough to constitute an imminent and substantial endangerment." *Me. People's All. & NRDC v. Mallinckrodt, Inc.*, 471 F.3d 277, 282 (1st Cir. 2006) (endorsing the district court's use of data to determine the specific risks associated with high mercury concentrations in river sediment); *see also Cordiano*, 575 F.3d at 211–12 (affirming summary judgment for defendant because plaintiff's sole evidence of an "imminent and substantial endangerment" was "the mere fact that some samples taken from the [defendant's] site may exceed [state] standards."). Ms. Lovejoy presents even less evidence of an endangerment. Conceding that all contaminants were found at safe levels, Dr. Simonton simply opines, without factual support, that any detectable concentration of contaminants constitutes an "imminent and substantial endangerment." [ECF No. 115 at 8–9; ECF No. 105-4 at 107–08]. Accepting Dr. Simonton's conclusion would impermissibly enlarge the scope of RCRA to include any speculative prospect of future harm, thereby effectively eliminating the requirement that an endangerment be "imminent and substantial."

Moreover, the very nature of the relief sought in this case suggests that a finding of an imminent and substantial endangerment would be, at best, premature.

Ms. Lovejoy asks the court to compel Amcox to perform a formal site investigation and determine the need for remediation. [ECF No. 102]. Dr. Simonton admits that "no one knows what risk these contaminants pose" based on the existing sample results, [ECF No. 102-2 at 3]; he repeatedly testifies that the only remedial action he can currently recommend is a full site assessment, [ECF No. 102-2 at 3; ECF No. 105-4 at 61, 108]; and he acknowledges that EPA would likely find that no action is required, [ECF No. 105-4 at 139]. *Cf. Cordiano*, 575 F.3d at 212 (noting plaintiff's report concluded "that evaluation of the degree of such risk would require a further risk assessment").

Because no reasonable jury could find that Ms. Lovejoy's evidence indicates an "imminent and substantial endangerment," Amcox's motion for summary judgment is **GRANTED** as to Count III, and Ms. Lovejoy's motion is **DENIED**.

### D. Relief for a private nuisance (Count V)

Amcox moves for summary judgment on Count V, arguing that Plaintiff cannot identify an act or omission that would render it liable for private nuisance. "A private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land." Syl. Pt. 1, *Hendricks v. Stalnaker*, 380 S.E.2d 198, 199 (W. Va. 1989). In order for an interference to be "substantial," the interference must be a "real and appreciable invasion of the plaintiff's interests," which means "more than slight inconvenience or petty annoyance." *Carter v. Monsanto Co.*, 575 S.E.2d 342, 347 (W. Va. 2002) (quoting Restatement (Second) of Torts § 821F(c) (1979)). An

interference is "unreasonable" "when the gravity of the harm outweighs the social value of the activity alleged to cause the harm." Syl. Pt. 2, *Hendricks*, 380 S.E.2d at 199.

Even if Ms. Lovejoy can establish interference with the use and enjoyment of her property, nothing in the record supports finding that interference "substantial and unreasonable." The undisputed facts are that none of the identified contaminants rose to levels of toxicological concern, and no one has experienced negative health effects from residing on the property or consuming substances originating from it. Accordingly, any economic losses suffered by Ms. Lovejoy are the result of independent decisions and cannot be causally attributed to Defendant.[7] *De minimis* contamination levels do not constitute a nuisance, *In re Wildwood Litig.*, 52 F.3d 499, 503 (4th Cir. 1995), nor do well-founded fears that harmful contamination levels exist, *Carter*, 575 S.E.2d at 347.

As noted above, Ms. Lovejoy presents just enough evidence to survive summary judgment under the relaxed burdens imposed by CERCLA. Congress expressly enacted CERCLA to encourage private cleanups and to allocate cleanup costs among potentially responsible parties. In pursuit of those ends, CERCLA requires minimal showings of injury and causation before imposing liability on a defendant responsible for releasing hazardous substances. Private nuisance, by contrast, is "a species of tort liability" which requires a more definite showing of harm. *Carter*, 575 S.E.2d at 347.

---

[7] Because Ms. Lovejoy's nuisance claim fails as a matter of law, I do not analyze her alleged economic losses, but I note that evidence of such losses is lacking.

Because Ms. Lovejoy cannot show that the alleged contamination substantially or unreasonably interfered with the use and enjoyment of her property, Amcox's motion for summary judgment on Count V is **GRANTED**, and Ms. Lovejoy's motion is **DENIED**.

### E. Negligence (Count VI)

Amcox moves for summary judgment on Ms. Lovejoy's negligence claim. To prevail, Ms. Lovejoy must demonstrate, by a preponderance of the evidence, that (1) Amcox owed her a duty; (2) Amcox breached that duty by an act or omission; and (3) the breach of the duty proximately caused the injuries that she suffered. *See Wheeling Park Comm'n v. Dattoli*, 787 S.E.2d 546, 551 (W. Va. 2016). I found that Jackson—as past owner of the natural gas pipeline that transverses the land in question—did owe Ms. Lovejoy a duty of care. Imposing a duty of care on Jackson for the time it owned and operated the pipeline is consistent with public policy and federal and state environmental regulatory law. [ECF No. 56 at 20 ("It is reasonably foreseeable that hazardous chemicals moving in a pipeline will, if not properly stored or managed, leak, spill, seep, or otherwise emit from the pipeline and create an endangerment to the property on which the pipeline sits and to the owner of that property.")]. I hold Amcox to the same duty of care, as the same principles apply to it as current owner of the natural gas pipeline.

Amcox argues that Ms. Lovejoy has not established breach, causation, or injury. Amcox reiterates that Ms. Lovejoy has not yet been able to name the act or

33

omission that proximately caused the harm described in the Amended Complaint. Amcox maintains that Ms. Lovejoy has failed to show that Amcox ever handled, transported, or stored contaminants in the first place. Ms. Lovejoy instead relies on the previously discussed inference that the Facility is the only plausible source of contamination.

Like her claim for private nuisance, Ms. Lovejoy's negligence claim must fail for lack of an injury recognized in tort law. The presence of contaminants, "standing alone, cannot establish harm or injury for purposes of proving a negligence claim under West Virginia law. In such situations, a plaintiff also must produce evidence of a detrimental effect to the plaintiff[']s[] health that actually has occurred or is reasonably certain to occur due to a present harm." *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 95 (4th Cir. 2011) (citing *Cook v. Cook*, 607 S.E.2d 459, 464 (W. Va. 2004)). Defendant Amcox's motion for summary judgment is **GRANTED**.

## IV.  Conclusion

For the foregoing reasons, Ms. Lovejoy's Motions for Summary Judgment, Entry of Lump-Sum Judgment, Declaratory Judgment, and for Entry of Appropriate Permanent Injunctive Relief [ECF No. 102] are **DENIED**; Amcox's Motion for Summary Judgment [ECF No. 106] is **GRANTED** as it pertains to Counts III, V, and VI, and **DENIED** as it pertains to Counts I and II. The remaining claims—for response costs under CERCLA (Count I) and for relief from permitting violations under RCRA and the WVHWMA (Count II)—involve questions of fact that, while

material, do not appear to be substantial. The issues remaining for trial should be viewed by the parties as more readily susceptible to private resolution.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      December 9, 2022

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

35